UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

       v.                                CASE NO. 8:13-CR-198-T-30TGW

ANDREW BLANE FIELDS

**UNITED STATES' SENTENCING MEMORANDUM
IN SUPPORT OF VULNERABLE VICTIM AND ROLE ENHANCEMENTS**

The United States of America, by A. Lee Bentley, III, Acting United States Attorney for the Middle District of Florida, by and through the undersigned counsel, hereby submits this Sentencing Memorandum in support of enhancements for vulnerable victims and the Defendant's aggravated role.

**I.    Introduction**

On August 22, 2013, the Defendant was charged by superseding indictment with five counts of sex trafficking, one count of conspiracy to possess with the intent to distribute controlled substances, one count of knowingly distributing controlled substances, and one count of possessing with the intent to distribute controlled substances. (Doc. 26). On November 6, 2013, a jury convicted the Defendant on all counts. (Doc. 120). The Defendant is scheduled to be sentenced on January 29, 2014.

In preparation for the sentencing hearing, the United States Probation Office prepared a Presentence Investigation Report (PSR). The PSR did not include adjustments to the Defendant's sentencing guidelines calculations to account for the vulnerability of the victims or the Defendant's aggravated role in

the drug conspiracy. For the reasons set forth below, the Defendant should receive a 2-level enhancement for each sex trafficking victim because he knew or should have known that the victims of the sex trafficking offenses were vulnerable victims. Additionally, the Defendant should receive a 2-level enhancement for his role in the drug conspiracy, as well as an additional 2-level enhancement for the victims' vulnerability, and/or because his conduct was part of a pattern of criminal conduct engaged in as a livelihood.

## II. Government's Evidence at Trial

The Government demonstrated at trial that the Defendant recruited the victims to prostitute for him, providing them with transportation, protection, shelter, promises of increased income, and access to addictive drugs in exchange for a portion (and eventually all) of their prostitution proceeds. Four of the five victims were already involved in prostitution, and all of the victims had some level of experience in using illegal drugs (although not all of the victims were addicted to drugs, and certainly not to prescription to pills), before meeting the Defendant. Once the victims agreed to prostitute for the him, the Defendant would photograph the victims in sexually suggestive clothing and poses; create commercial sex advertisements for the victims; instruct the victims on how to speak to the clients or "johns" on the phone; transport the victims to the clients' location for the commercial sex act; wait for the victim to complete the commercial sex act guarding against assault, theft, or arrest; transport the victim home; and keep a percentage of the proceeds from the commercial sex act.

The evidence at trial further demonstrated that the Defendant stock-piled prescription pain medication ("pills"), such as Oxycodone, using his own prescriptions and the prescriptions he purchased from others.  The Government established that Oxycodone is a highly addictive opiate, and that regular use will predictably result in withdrawal sickness when the use is interrupted or discontinued.  The Defendant sold the pills to the victims, mostly on credit, and encouraged the victims to use the pills.  While each of the victims had some experience with using illegal drugs, including pills, all of the victims testified that their pill-use increased once they were prostituting for the Defendant.  All of the victims testified that during their time with the Defendant, they were addicted to pills, and their addiction had never been worse than during that period of time.

Each victim testified that her addiction was so severe that she suffered from opiate withdrawal sickness when she did not routinely take pills.  The victims referred to opiate withdrawal sickness as getting "pill sick."  All of the victims described their intense fear of getting pill sick. Each victim described experiencing a combination of painful physical and psychological symptoms associated with being pill sick, including seizures, fever, chills, cramping, vomiting, and diarrhea, calling it "worse than death."  The evidence showed that the Defendant had a keen knowledge of prescription pain medication, addiction, and the effects of withdrawal.  The victims testified that their addictions during the time they were with the Defendant were such that they were using pills not to chase a high, but rather to fend off sickness.

The Government's evidence established that when the victims ran out of money to buy pills, the Defendant "fronted" the pills to the victims on credit. The Defendant kept careful track of the victims' debt. The evidence showed that once the victims fell into debt, the Defendant kept all of the proceeds of the victims' commercial sex acts, pressuring them to pay down their "bill." Without funds, the victims grew dependent on the Defendant for their access to pills, and in some cases, to other basic necessities, such as food and shelter. In control of the victims' access to pills, and thus controlling the onset of withdrawal sickness, the evidence established that the Defendant successfully positioned himself to dictate all aspects of the victims' commercial sex work. The testimony of the victims demonstrated plainly that if the victims complained about prostituting or refused to prostitute, the Defendant would withhold, or threaten to withhold, the pills. When withdrawal sickness set in, or due to the fear of impending withdrawal sickness, the victims would relent and agree to resume prostituting for the Defendant in exchange for pills to ease the painful withdrawal symptoms.

The evidence demonstrated that the Defendant intended to make the victims believe (and the victims did, in fact, believe) that they would suffer the effects of withdrawal sickness if they did not pay down their debt. Each of the victims testified that there were only two ways to pay down their debt – engage in commercial sex and turn over all of the proceeds to the Defendant, or engage in sex acts with the Defendant.

### III.  Sentencing Guidelines Calculations

### A.  Vulnerable Victims

Each of the five sex trafficking victims in this case was a vulnerable victim. Under U.S.S.G. § 3A1.1(b)(1), a vulnerable victim is defined in the Commentary as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  In this case, all five victims testified that they were addicted to pills, and as a result of their addictions, feared the physical and psychological pain of withdrawal sickness. The victims' pill addictions rendered them unusually vulnerable and particularly susceptible to the Defendant's crimes because pill addiction was the lynchpin of the Defendant's scheme by which he compelled his victims to continue to engage in commercial sex.  As described above, the evidence at trial demonstrated how the Defendant used pill addiction, debt, and the fear of withdrawal sickness as a means of coercion in violation of 18 U.S.C. § 1591.

To be clear, the Government does not suggest that every sex trafficking victim who suffers a drug addiction is a "vulnerable victim" within the meaning of § 3A1.1(b)(1).  Certainly, there are sex trafficking cases in which a victim's drug addiction could be entirely irrelevant to the facts of the case.  But this is not such a case.  The victims in this case were vulnerable victims precisely because of their addictions.  The Defendant seized upon and cultivated the victims' addictions in order to coerce them to continue engaging in commercial sex acts.

5

The defendant's "scheme, plan, or pattern," as that phrase is used in § 1591, was entirely based upon the manipulation of the victims' pill addiction, their debt (from purchasing pills to feed their addiction), and their fear of withdrawal sickness (caused by their pill addiction).

In United States v. Amedeo, 370 F.3d 1305 (11th Cir. 2004), the Court of Appeals addressed the question of whether a victim's drug addiction rendered him vulnerable within the meaning of § 3A1.1(b)(1). The Court noted that not every victim with a drug addiction is vulnerable, but rather, the determination must take into account the totality of the circumstances. Id. at 1318 n.10. In Amedeo, the District Court found that the 18-year-old sex assault victim "was predisposed to accept incapacitating drugs," and that the defendant "knew of this weakness," and that the defendant gave the victim "such drugs to render him physically vulnerable to a nonconsensual sexual encounter." Id. at 1317. Without addressing the victim's vulnerability to the sexual assault, the Court of Appeals simply looked at the defendant's distribution of the controlled substance and found sufficient evidence to support the conclusion that the victim's "drug addiction rendered him unusually vulnerable to [the defendant] supplying him cocaine." Id.

Recently, the Court of Appeals in United States v. Harbison, 523 F. App'x 569 (11th Cir. 2013) examined Amedeo, and the question of a victim's drug addiction in relation to § 3A1.1. In Harbison, the Court explained:

> We have previously held that, where the defendant provided drugs to a minor victim, whom the defendant knew suffered from a drug addiction, the sentencing court properly imposed a two-level vulnerable victim enhancement. *See United States v. Amedeo*, 370

6

> F.3d 1305, 1317-18 (11th Cir. 2004) (district court's determination regarding application of § 3A1.1 is a factual finding subject to clear error review). *Amedeo* teaches that in determining whether a § 3A1.1 vulnerable victim enhancement is applicable, it is appropriate to consider: 1) the victim's history of drug use and/or drug addiction; 2) the defendant's awareness of the victim's drug addiction; and 3) the victim's age. <u>Id.</u>

<u>Harbison</u>, 523 F. App'x at 578.

In the instant case: (1) all of the victims testified that during their time with the Defendant, they were addicted to pills and their addiction had never been worse than during that period of time; (2) the evidence showed that the Defendant had knowledge of the victims' addictions, as well as knowledge of prescription pain medication, addiction generally, and the effects of withdrawal; and (3) while not a determinative factor, four of the five victims were young adults, with victim J.R. in particular, being only slightly over 18 years old when she first encountered the Defendant.

The instant case is similar to <u>Amedeo</u> and <u>Harbison</u> in that in all of these cases, the defendants' distribution of a controlled substance to their addicted victims was done for the purpose of committing the prohibited acts. Here, the Defendant was able to coerce the five sex trafficking victims in this case precisely because of their particular vulnerability of being addicted to prescription pain medication. Simply stated, the Defendant's scheme would not have worked on a person who was not addicted to pills. A non-addict would not have fallen into debt from purchasing pills, and more important, would not have feared the pain of withdrawal sickness. The Defendant preyed upon and exploited the victims'

addictions and fear of withdrawal to coerce them to continue engaging in commercial sex acts.

It is noteworthy that the Court in Harbison rejected the argument that the victim's voluntary consumption of the drugs negated his vulnerable status. The Court explained:

> Counsel next argued, without reference to any authority, that a victim's voluntary use of a controlled substance necessarily weighed against application of the enhancement. We reject this position as well. Section 2D1.1(e)(1) of the Guidelines contemplates that application of the vulnerable victim enhancement is appropriate where a controlled substance is made available (distributed) to the intended victim of a sexual offense *with or without the victim's knowledge*. See U.S.S.G. § 2D1.1(e)(1).

Harbison, 523 F. App'x at 578 (emphasis in original).

Courts in other circuits have come to similar conclusions regarding drug addiction as an issue of victim vulnerability. In United States v. Sidhu, 130 F.3d 644, 655 (5th Cir. 1997), the Fifth Circuit found in a fraud case that the defendant's victims "were often debilitated by pain or depression, and easily became addicted to the treatment" proffered by the defendant. The Court found evidence in the record that the defendant "preyed upon vulnerable patients by addicting them to morphine in order to support his fraudulent billing scheme." The defendant's billing scheme in Sidhu is analogous to the Defendant's coercive sex trafficking scheme in this case. The success of both schemes depended on the victims' consumption of pain medication, and addicts are particularly vulnerable to such schemes. See also United States v. Evans, 272 F.3d 1069, 1095 (8th Cir. 2001) (in upholding the § 3A1.1 enhancement, the Court found that defendant took advantage of the victim's addiction – "encouraging and

8

contributing to her addiction by furnishing her with drugs to prevent her from leaving . . . ."); United States v. Pavao, 948 F.2d 74, 78 (1st Cir. 1991) (in affirming the vulnerable victim enhancement, the Court noted the District Court's finding that victim was "drug user" and "the defendant knew it," and "played on that vulnerability" to carry out his scheme).

**B.	Defendant's Role in Conspiracy**

The Defendant should also receive a 2-level enhancement pursuant to U.S.S.G. § 3B1.1(c) for his role as an organizer, leader, manager, or supervisor in the conspiracy to possess with the intent to distribute controlled substances. If the Court finds the aggravating role enhancement applicable, an additional 2-level enhancement would be warranted under U.S.S.G. §§ 2D1.1(b)(14)(B) or (E), as the victims were vulnerable and/or the Defendant committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood.

Section 3B1.1 (Aggravating Role) of the Guidelines provides for a 2-level enhancement if the Defendant was an organizer, leader, manager, or supervisor in any criminal activity that involved fewer than five participants. For this enhancement to apply, there "must be evidence that the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity." United States v. Martinez, 584 F.3d 1022, 1026 (11th Cir. 2009). "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." United States v. Jiminez, 224 F.3d 1243, 1251 (11th Cir. 2000); see also United States v. Lozano, 490 F.3d 1317, 1323 (11th Cir. 2007).

9

The trial evidence of the conspiracy included testimony from Paul Frye, who testified that he provided the Defendant with a share of his Dilaudid and Morphine pills in exchange for the Defendant providing Mr. Frye with money to pay for his doctor appointments and prescriptions. The evidence further established that the Defendant then distributed the Dilaudid and Morphine he obtained from Mr. Frye to at least one of the victims, K.W. Similarly, victims K.W. and J.R. both testified that the Defendant purchased drugs from Richard Braden ("Mumbles"). Franklin Hough testified that he sold Dilaudid to Mumbles, and Mr. Hough's pill bottles were found in the Defendant's home during the search warrant. The dates on one of Hough's pill bottles found in the Defendant's residence approximately correspond with the date that the Defendant distributed Dilaudid to victim J.R. at Trinity Hospital, indicating that the Defendant was in possession of Dilaudid at the time.

Importantly, the evidence at trial supports a finding that the Defendant exercised authority and control over at least Paul Frye during their conspiracy. The Defendant provided Mr. Frye with the funds necessary to see a physician to obtain the prescriptions for pain medications. After the physician provided Mr. Frye with prescriptions for Dilaudid and Morphine, the Defendant required Mr. Frye to hand over the prescriptions to the Defendant to hold until the Defendant was ready for Mr. Frye to fill the prescriptions at a later time. When the Defendant was ready to fill the prescriptions and had the funds to pay for them, he would contact Mr. Frye and take him to a pharmacy to fill the prescriptions. The Defendant would provide Mr. Frye with the funds to pay for the prescriptions,

and keep a portion of the pills. The Defendant insisted on possessing Mr. Frye's prescriptions in order to ensure Mr. Frye's compliance in the conspiracy. Indeed, unfilled prescriptions in Mr. Frye's name were found in the Defendant's residence during the search warrant, thereby corroborating Mr. Frye's testimony.

Moreover, if the Court finds that the Defendant acted as an organizer, leader, manager, or supervisor, then the Court should apply an additional 2-level enhancement as the victims in this case were vulnerable and/or the Defendant committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood. Section 2D1.1(b)(14) of the Guidelines provides that if the Defendant received an adjustment for an aggravating role under § 3B1.1, then an additional 2-level increase may be warranted if one or more factors exist. Two of the listed factors in § 2D1.1(b)(14) are present in this case. Subsection (B) applies if the victim is vulnerable. Subsection (E) applies if the Defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood.

For the same reasons set forth above, each of the five victims in this case were vulnerable victims, making Subsection (B) applicable. Moreover, the evidence at trial showed that the Defendant placed advertisements for either himself as a "driver" for "escort services" (commercial sex), or for the victims or other women involved in commercial sex almost every day since he moved to Tampa until his arrest. The Defendant had no other job or source of income and relied on the proceeds from his illegal sex trafficking scheme as his the means to support himself. The evidence clearly showed that the conduct for which he was found guilty was his livelihood, making Subsection (E) applicable.

**IV.   CONCLUSION**

For the foregoing reasons, the Government respectfully requests that this Court apply the sentencing enhancements for vulnerable victims and the Defendant's aggravated role in the drug conspiracy.

                         Respectfully submitted,

                         A. LEE BENTLEY, III
                         Acting United States Attorney

By:   *s/Josephine W. Thomas*
       JOSEPHINE W. THOMAS
       Assistant United States Attorney
       Florida Bar No. 31435
       400 North Tampa Street, Suite 3200
       Tampa, FL  33602
       Telephone:   (813) 274-6000
       Facsimile:    (813) 274-6178
       Email: josie.thomas@usdoj.gov

       *s/William E. Nolan*
       WILLIAM E. NOLAN
       Trial Attorney, Department of Justice
       Civil Rights Division
       950 Pennsylvania Avenue N.W.
       Washington, DC  20530
       Telephone:   (202) 353-8560
       Facsimile:    (202) 514-8336
       Email: william.nolan@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Alec F. Hall, Esq.
Frank Zaremba, Esq.

*s/Josephine W. Thomas*
JOSEPHINE W. THOMAS
Assistant United States Attorney
Florida Bar No. 31435
400 North Tampa Street, Suite 3200
Tampa, FL  33602
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6178
Email: josie.thomas@usdoj.gov

*s/William E. Nolan*
WILLIAM E. NOLAN
Trial Attorney, Department of Justice
Civil Rights Division
950 Pennsylvania Avenue N.W.
Washington, DC  20530
Telephone:   (202) 353-8560
Facsimile:    (202) 514-8336
Email: william.nolan@usdoj.gov